**UNITED STATES, Appellee**

**v.**

**Sergeant Darren A. CARR, 496–82–9914, United States Army, Appellant.**

**ACMR 9202274.**

U.S. Army Court of Military Review.

Aug. 11, 1993.

---

For Appellant: Colonel Malcolm H. Squires, Jr., JAGC, Captain Victor A. Tall, JAGC (on brief).

For Appellee: Colonel Dayton M. Cramer, JAGC, Lieutenant Colonel Richard A. Cefola, JAGC, USAR, Major Kenneth T. Grant, JAGC (on brief).

Before De GIULIO, GONZALES, and PLACKE, Appellate Military Judges.

## OPINION OF THE COURT

PLACKE, Judge:[1]

Pursuant to his pleas, the appellant was convicted of two specifications of absence without leave (AWOL), two specifications of failure to repair, one specification each of wrongful use of cocaine, and dishonorably failing to maintain sufficient funds in

a bank checking account in violation of Articles 86, 112a, and 134, Uniform Code of Military Justice, 10 U.S.C. §§ 886, 912a, and 934 (1988) [hereinafter UCMJ]. He was sentenced by a military judge sitting as a general court-martial to a bad-conduct discharge, confinement for twelve months, forfeiture of $750.00 pay per month for twelve months, and reduction to Private E1. The convening authority approved the sentence.

The appellant, a sergeant, was returned to military control from an AWOL on 9 August 1992. He was assigned to the Personnel Control Facility (PCF) unit at Fort Ord, California, on 11 August 1992. Prior to his assignment to the PCF unit, he was assigned to B Battery, 2d Battalion, 62d Air Defense Artillery located at Fort Ord, California. The appellant asserted at trial that he was subjected to illegal pretrial punishment and sought additional credit against any sentence to confinement. The military judge found that the government's practice of altering pretrial soldiers' uniforms and not allowing them to wear insignia of rank was improper, but not done in bad faith, and denied the motion for appropriate relief.

The evidence of record reflects that all individuals who are assigned to the Processing Unit of the PCF at Fort Ord are issued uniforms. These uniforms do not have any army insignia, insignia of rank, or nametag. A Class A type nametag is given to each soldier and he is required to put his name on it with an embossing gun. All soldiers assigned to the Processing Unit, regardless of rank or military occupational specialty, are required to work in a group performing such tasks as cutting grass, buffing and stripping floors, loading furniture, working in the Public Affairs Office, scraping paint, picking up trash, and working in the Army Community Service Swap Shop. The details were under the supervision of a noncommissioned officer escort in most instances. All of the tasks performed by the members of the processing unit were performed in the "PCF uniform" in

---

1. Judge Allan L. Placke took final action on this case prior to his release from active duty.

full view of the military community at Fort Ord. The members of the processing unit were marched approximately one mile in the "PCF uniform" to the messhall. It was apparent to other military personnel on Fort Ord that the soldiers in the "PCF uniforms" were pending disciplinary action or were prisoners. None of the members of the processing unit, however, had been convicted of a crime. Soldiers in the Fort Ord military community called the appellant a "convict" or "criminal" and ridiculed him whenever he marched to the messhall or other places with the PCF group.

At the outset, we observe that Article 13, UCMJ, strictly prohibits punishment of a soldier prior to trial. This codal provision provides:

No person, while being held for trial, may be subjected to punishment or penalty other than arrest or confinement upon the charges pending against him, nor shall the arrest or confinement imposed upon him be any more rigorous than the circumstances require to insure his presence, but he may be subjected to minor punishment during that period for infractions of discipline.

UCMJ, art. 13.

In determining whether the treatment afforded appellant was a punishment or penalty for the purposes of this provision, we must examine the jurisprudence.

In *United States v. Cruz*, 25 M.J. 326 (C.M.A.1987), the battalion commanders held a mass formation wherein all soldiers suspected of drug abuse were called before the formation, their distinctive unit insignia (crests) were removed from their uniforms and they were marched to an adjacent site where they were individually searched and handcuffed in full view of the soldiers remaining in formation. They were called "bastards" and "criminals" by the brigade commander. The Court of Military Appeals had no difficulty finding that the treatment constituted punishment within the prohibition of Article 13, UCMJ. In that opinion, the court relied, to a great extent, on military experience finding that a historic type of military punishment of a soldier was the discharge with ignominy

which included "having their clothing stripped of all military insignia, or after being tarred and feathered, or with their heads shaved or half-shaved, or with straw halters around their necks or bearing placards inscribed with the names of their offenses." *See* Winthrop, *Military Law and Precedents*, 434 (2d ed. 1920 Reprint).

The court in *United States v. James*, 28 M.J. 214 (C.M.A.1989) found that the accused's confinement in a civilian jail was subject to the same scrutiny as confinement in a facility operated by the military. The conditions under which the accused was held included the requirement that he wear an orange jumpsuit, as did civilian prisoners, instead of his uniform and assist with the daily cleaning of his cell. The court found that no violation of Article 13, UCMJ, occurred and the conditions existing in the facility were related to the orderly operation of the facility and no more stringent or rigorous than to insure the presence of the accused for trial. *See also United States v. Walker*, 27 M.J. 878 (A.C.M.R.1989); *United States v. Daniels*, 23 M.J. 867 (A.C.M.R.1987).

The Court of Military Appeals has expressed the precept that the treatment or condition of a pretrial confinee must either be intended as punishment or amount to punishment before it becomes violative of a statute. In *United States v. Palmiter*, 20 M.J. 90, 94 (C.M.A.1985), the accused was confined with sentenced prisoners. In finding that there was no violation of Article 13, UCMJ, the court adopted the following analysis from the United States Supreme Court:

In the absence of a showing of intent to punish, a court must look to see if a particular restriction or condition, which may on its face appear to be punishment, is instead but an incident of a legitimate nonpunitive governmental objective.

*Bell v. Wolfish*, 441 U.S. 520, 529 at 539, 99 S.Ct. 1861 at 1874, 60 L.Ed.2d 447 (1979).

The *Palmiter* court distinguished the facts in that case from *United States v. Pringle*, 19 U.S.C.M.A. 324, 41 C.M.R. 324

(1970) and *United States v. Nelson,* 18 U.S.C.M.A. 177, 39 C.M.R. 177 (1969) since the accused did not serve on details with those performing "hard labor."

In *United States v. Herrin,* 32 M.J. 983 (A.C.M.R.1991), the accused, a sergeant, was required to work in immediate association with lower ranking convicted prisoners and to perform work inconsistent with his status as a noncommissioned officer. He was required to cut firewood, move and fill sandbags, and other menial work such as general cleaning. In rejecting the trial judge's findings that the violations of government standards and Army regulations were justified for the purpose of security and control, the court observed:

> This court must look at the totality of the conditions of the appellant's confinement in determining whether the pretrial conditions imposed upon him as a noncommissioned officer were of such a nature as to constitute a "punishment or penalty" within the meaning of Article 13. In this regard, we recognize that deference should be given to the decisions of correctional facility commanders on the procedures and conditions necessary for the proper operation and administration of a confinement facility. *United States v. Austin,* 25 M.J. 639 (A.C.M.R.1987). Also in *United States v. Palmiter,* Judge Cox noted that "[u]nder no circumstances should the prisoner be the one to dictate the terms and conditions of his confinement. This should always be left up to the correctional facility commanders and the respective services." *Palmiter,* 20 M.J. at 96.

*Herrin,* 32 M.J. at 985.

We are not unmindful of the decision of the Air Force Court of Military Review in *United States v. Marston,* 22 M.J. 850 (A.F.C.M.R.1986). In that case, the accused, was not allowed to wear any grade insignia while in pretrial confinement. This policy was implemented by the Air Force at Homestead Air Force Base to ensure that "everyone is considered equal" in prison. While the court found this procedure to violate Air Force regulations, it did not find the denial of this privilege to be so onerous that it violated Article 13.

However, we find *Marston* to be inapplicable to the facts of this case. The appellant was not in pretrial confinement and therefore the rationale that everyone should be considered "equal" in prison simply does not apply. The appellant was simply assigned to the Processing Unit of the PCF and was not in prison. He was pending disciplinary action as were many soldiers who were still assigned to their regular units. Unlike the appellant, the accused in *Marston* was not required to appear in public on the military facility in a uniform which gave the appearance that he was a sentenced prisoner on a work detail. There is no evidence that the accused in *Marston* suffered any public embarrassment or humiliation as did the appellant in this case.

In this case, the appellant arrived at the Processing Unit with his uniform complete with insignia of rank, sewn on nametag, and insignia. He was ordered to remove his insignia of rank, nametag, and insignia from his uniform and not allowed to wear his uniform. He was issued the standard "PCF uniform" and required to wear this uniform in public. Obviously, it was quite apparent to anyone in the military that appellant had a different status in the military community because the uniform he was required to wear had no rank or army insignia.

■ The military judge correctly found that the conduct of the government in requiring soldiers to alter their uniforms so that they do not comply with government standards and not allowing them to wear their insignia of rank was improper. In this case, the military judge found that the government did not act in "bad faith" because the practice was longstanding and he found that there was no intent to punish or humiliate. However, the test is not only whether the government intended to punish or humiliate, but also whether the conduct serves a legitimate nonpunitive governmental objective.

The only witness called by the government to explain the purpose for the condi-

tions to which the appellant was subjected was First Sergeant Jackson who had been at the PCF since December 1991. In his testimony, Sergeant Jackson testified that an individual would be allowed to wear his own uniform without the insignia of rank, but he could not remember any that were allowed to do so. He did not know if a soldier was allowed to wear the black and white nameplate on the uniform. He also admitted that the soldiers were not allowed to wear army insignia. First Sergeant Jackson agreed that the uniform would draw attention since it did not comply with government standards.

The rationale advanced by the government through the testimony of First Sergeant Jackson for the above conditions to which the appellant was subjected is set forth as follows:

Q. First Sergeant, why do they not where [sic] name tag—standard name tags or their rank when assigned to the PCF?

A. The reason why they don't where [sic] the standard name tag is because we have fit these soldiers when they come back under military control in what uniform we have available to us. If we have to have everyone with name tags, every soldier that walked in here, they're swapping uniforms. When one go, another one come in that use the same uniform. We will find ourself, some kind of way, trying to find the funds to make standard name tags and having these name tags sewed on a uniform that we provide for these soldiers.

Q. Why do you not have the rank on the uniforms?

A. The reason why I don't have the rank on there is not because I don't have the rank on there. It was a standard that was set long before I came to the Personnel Control Facility. So it's not a rule that I've created while I—when I got there. But the reason is, from what I understand, is that we get all ranks in there from the DFRs that are returning to military control, from E–1 all the way up through E–8, even captains. I have limited staff over there, approximately

16 people. And I have 16 people to take care of—most of the time—some 23, or even more, returned to military control soldiers. These guys are various ranks. I have to put E–4's in charge of marching them to the mess hall. And if they wear rank, then they're not gonna want to listen to that E–4, that private, that have control by virtue of being the cadre and have to get this person to the mess hall.

Q. Are you saying, then, if they wore rank, it would be difficult for you to accomplish the mission you've got?

A. It would be extremely difficult for us to accomplish the mission. It would even be even hard for me, if I was to get a lieutenant in that was returned to military control from AWOL and I'm just a First Sergeant. The only person that would be able to tell that person what to do would be that captain above. And that's the problem. That's just the problem. That's what we're faced with. We have a staff over there. And my staff is all—mostly E–4s and below. And we have to accommodate our mission the best we can. And that's what we try to do.

■ In this case, we find that the conditions to which the appellant was subjected amount to punishment or penalty in violation of Article 13, UCMJ. The testimony offered by First Sergeant Jackson that the practice not to adhere to uniform standards is justified (from what he understood) because of the funds, inconvenience, lack of personnel, and it simply being a long standing policy is not persuasive. The appellant was subjected to punishment or penalty when he was required to remove his insignia of rank, nametag, and unit insignia off of his uniform and wear a nonstandard "PCF" uniform in public on the military installation. The appellant appeared, for all intents and purposes, to be a prisoner on a work detail. The humiliation and ridicule that followed was clearly unnecessary and inappropriate for a Sergeant (E5) to endure. This is particularly true since the appellant had to endure the conditions from 11 August 1992 to 3 October 1992. Al-

though there may have been a legitimate purpose for the work details, we find, after viewing the totality of the circumstances, that the appellant's treatment was meant to be punishment. We do not find that the government justified its failure to comply with its own standards. Additionally, the appellant, a sergeant, was required to perform work inconsistent with his insignia of rank and status as a noncommissioned officer. *See* Army Reg. 190–47 Military Police: The United States Army Correctional System (1 Nov.1978), and *Herrin,* 32 M.J. 983 (A.C.M.R.1991).

We have considered the other error assigned by appellant and find it to be without merit.

■ Where an unlawful punishment or penalty has been imposed in violation of Article 13, UCMJ, the appropriate remedy is reassessment of the sentence. *Nelson,* 39 C.M.R. at 181–182; *United States v. Fitzsimmons,* 33 M.J. 710 (A.C.M.R.1991); *United States v. Moore,* 32 M.J. 774 (A.C.M.R.1991); *United States v. Hoover,* 24 M.J. 874 (A.C.M.R.1987). The findings of guilty are affirmed. Reassessing the sentence in view of the prior unlawful punishment, the entire record, and *United States v. Sales,* 22 M.J. 305 (C.M.A.1986), only so much of the sentence is affirmed as provides for as bad-conduct discharge, confinement for nine months, forfeiture of $750.00 pay per month for nine months, and reduction to Private E1.

Senior Judge De GIULIO and Judge GONZALES concur.